**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

SONYA IVANOVS and KATIE          1:17-cv-01742-NLH-AMD
HOFFMAN, ON BEHALF OF
THEMSELVES AND ALL OTHER          OPINION
SIMILARLY SITUATED EMPLOYEES,

           Plaintiffs,

    v.

BAYADA HOME HEALTH CARE,
INC.,
           Defendant.

---

Appearances:

MICHAEL JOHN PALITZ
SHAVITZ LAW GROUP, P.A.
800 3RD AVE.
SUITE 2800
New York, N.Y. 10022

    *On behalf of Plaintiffs*

MICHAEL D. HOMANS
HOMANS PECK, LLC
1500 JOHN F. KENNEDY BLVD.
STE. 520
PHILADELPHIA, PA. 19102

    *On behalf of Defendant*

**HILLMAN**, District Judge

    Pending before the Court are Defendant BAYADA Home Health

Care, Inc.'s renewed motions for judgment as a matter of law.

(ECF 328; ECF 329).  For the reasons expressed below, BAYADA's

motions will be denied.

## I. Background

BAYADA is a healthcare company incorporated in Pennsylvania and principally based in Moorestown, New Jersey.  (ECF 1 at ¶¶ 18-19).  Named Plaintiffs Sonya Ivanovs and Katie Hoffman (collectively "Plaintiffs") are citizens of New Jersey and Minnesota, respectively, who both worked as client services managers ("CSMs") for BAYADA.  (Id. at ¶¶ 12, 15).  Named Plaintiffs allege – on behalf of themselves and a collective of former BAYADA CSMs and those who have held comparable positions – that BAYADA unlawfully classifies such positions as exempt from overtime requirements in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq., while employees perform primarily non-exempt duties in practice.  (Id. at ¶¶ 2-4, 11).

A jury trial was held from January 19, 2023 to February 6, 2023 with seven Testifying Plaintiffs representing the collective of sixty-two total Plaintiffs.[1]  Undisclosed to the jury, the Court bifurcated the trial, with Phase 1 limited to liability and then, depending on the jury's response to liability-specific interrogatories, Phase 2 was to determine damages as necessary.  Additionally, depending on the jury's

---

[1] Separately, BAYADA called Opt-In Plaintiffs Anika Downer and Deidre Taylor as witnesses as part of its case.

responses to the liability-specific interrogatories in Phase 1, an additional instruction and two more interrogatories may have followed relating to whether Testifying Plaintiffs for whom liability was found were representative of two sets of non-testifying CSMs.

On February 1, 2023, prior to the case being submitted to the jury for deliberation as to liability, Plaintiffs filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) with respect to BAYADA's executive-exemption defense, (ECF 292), and BAYADA moved for judgment as a matter of law relating to the applicability of the fluctuating workweek ("FWW") method of calculating damages and the alleged failure of Testifying Plaintiffs to demonstrate that they represented sufficiently the opt-ins who had not testified. (ECF 295; ECF 296).  The Court did not rule on the motions and the case was submitted to the jury as to liability.

The jury concluded that named Plaintiff Ivanovs failed to meet her threshold burden of demonstrating that she worked more than forty hours in any given week during the identified period, (ECF 311), and judgment was entered in favor of BAYADA and against Ivanovs, (ECF 327).[2]  However, the jury was unable to

---

[2] Ivanovs filed a notice of appeal on March 28, 2023.  (ECF 335).
The appeal was dismissed pursuant to Federal Rule of Appellate
Procedure 42(b) on April 18, 2023.  (ECF 338).  The Court's
analysis in this opinion does not rely on testimony or other

reach a verdict as to the other three liability interrogatories submitted to it – the applicability of the executive, administrative, and combination exemptions as to the other Testifying Plaintiffs and the Court declared a mistrial.  (ECF 302; ECF 311; Trial Tr. 1890:3-6).  Therefore, the representative interrogatories were not presented to the jury and Phase 2 of the trial did not take place.  The Court provided the parties twenty-eight days to renew their motions for judgment as a matter of law consistent with Federal Rule of Civil Procedure 50(b).  (ECF 302).

BAYADA timely renewed its motions.  (ECF 328; ECF 329).  Plaintiffs filed oppositions, (ECF 330; ECF 331), to which BAYADA replied, (ECF 333; ECF 334).

## II. Discussion

### A. Jurisdiction

The Court possesses original jurisdiction over this action as Plaintiffs' claims are based on alleged violations of the FLSA.  See 28 U.S.C. § 1331.

### B. Rule 50

A motion for judgment as a matter of law may be made after a party has been fully heard on an issue during a jury trial and prior to the case being submitted to the jury.  Fed. R. Civ. P.

---

evidence specific to her.

4

50(a).  A motion for judgment as a matter of law pursuant to Rule 50(a) "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 373 (3d Cir. 2016) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)).  Though Rule 50(a) provides courts with the power to enter judgment as a matter of law, submission of a case to a jury is generally preferred to granting such motions.  See Baran v. ASRC Fed., Mission Sols., 401 F. Supp. 3d 471, 479 (D.N.J. July 9, 2019) (citing Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 405 (2006)).

If a court does not grant a motion for judgment as a matter of law pursuant to Rule 50(a), the movant may renew their motion within twenty-eight days of entry of judgment or, if related to a jury issue not decided by a verdict, within twenty-eight days of the jury's discharge.  Fed. R. Civ. P. 50(b).  The standard for considering a renewed motion per Rule 50(b) is the same as that for a Rule 50(a) motion and, without weighing evidence or witness credibility, a court should grant a renewed motion only "if 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'"

5

_Baran_, 401 F. Supp. 3d at 479-80 (quoting _Raiczyk v. Ocean Cnty._
_Veterinary Hosp._, 377 F.3d 266, 269 (3d Cir. 2004)); _see also_
_Kars 4 Kids Inc. v. America Can!_, 8 F.4th 209, 218 n.8 (3d Cir.
2021) ("When evaluating 'whether the evidence is sufficient to
sustain liability, the court may not weigh the evidence,
determine the credibility of witnesses, or substitute its
version of the facts for the jury's version.'  'The question is
not whether there is literally no evidence supporting the party
against whom the motion is directed but whether there is
evidence upon which the jury could properly find a verdict for
that party.'" (quoting _Lightning Lube, Inc.,_ 4 F.3d at 1166 and
then _Jaasma v. Shell Oil Co.,_ 412 F.3d 501, 503 (3d Cir.
2005))).

## III. Analysis

### A. BAYADA's Motion as to Representativeness (ECF 328)

BAYADA first seeks judgment as a matter of law with respect
to the sufficiency with which the seven Testifying Plaintiffs
represented the other fifty-five members of the collective at
trial.  Trial evidence varied among Testifying Plaintiffs in
terms of their ability to evaluate and adjust pay for staff,
recruit and interview, run meetings, and perform similar tasks,
according to BAYADA.  (ECF 328-1 at 6-17, 24-25).  It argues
that Plaintiffs failed to explain how the seven Testifying
Plaintiffs were selected, (id. at 20-21), establish how the

Testifying Plaintiffs were aware of the circumstances of other opt-ins, (id. at 19-20), or present a corporate policy or decision preventing CSMs from performing managerial duties – instead opting for individualized evidence.  (Id. at 21-24). The fact-intensive nature of misclassification cases render them inappropriate for collective treatment and courts may find a lack of representativeness among plaintiffs even after final certification of the collective and trial, (id. at 26-28 (citing Johnson v. Big Lots, 561 F. Supp. 2d 567 (E.D. La. 2008))), and BAYADA contends that its due-process rights would be violated by Non-Testifying Plaintiffs prevailing without it being able to assert individualized defenses and relieving Non-Testifying Plaintiffs of their burden of proving their claims would also violate the Rules Enabling Act, (id. at 28-30).  It therefore asks the Court to either dismiss the claims of Non-Testifying Plaintiffs or, alternatively, decertify the collective action. (Id. at 1).

The FLSA generally requires employees who work more than forty hours per week to be compensated for hours worked in excess of forty at a rate of at least one-and-a-half times their regular rate of pay.  See 29 U.S.C. § 207(a)(1).  Employers may be held liable for unpaid overtime and recovery actions may be brought "by any one or more employees for and [on] behalf of himself or themselves and other employees similarly situated."

§ 216(b).  "Similarly situated" is not defined in the FLSA.  See Arriaga v. Anthony Logistics of Hudson Cnty. LLC, No: 22-495, 2023 WL 2706822, at *2 (D.N.J. Mar. 30, 2023).  However, "similarly situated" may be demonstrated by showing that the employees "suffer[ed] from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs" and such a demonstration may be made even if the employer maintains policies consistent with the FLSA.  Reinig v. RBS Citizens, N.A., No. 2:15-CV-01042, 2017 WL 8941219, at *13 (W.D. Pa. Aug. 2, 2017) (report of special master) (quoting Harris v. Chipotle Mexican Grill, Inc., No. 13-cv-1719, 2017 WL 2537228 at *6 (D. Minn. June 12, 2017)); see also Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 538 (3d Cir. 2012) ("Being similarly situated . . . . means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA."); see also cf. Johnson, 561 F. Supp. 2d at 580, 583 (noting that questionnaire responses of opt-ins varied in numerous ways, including half of respondents regularly hiring associates, more than a quarter regularly terminating employees, and nearly two-thirds regularly setting the work schedules of others and disciplining employees and that "[t]he plaintiffs' testimony on whether their primary or most important duties entail[ed] management activities [wa]s a mixed bag").

Pre-trial, the Court was persuaded by a discussion in the Third Circuit's Fischer v. Federal Express Corp. differentiating FLSA collective actions brought pursuant to Section 216(b) from Rule 23 class actions, noting that Section 216(b) only requires that opt-in plaintiffs be "similarly situated" to the employees bringing forth the action and that "many of the rules specific to class actions have evolved to protect the due process rights of absent class members, a consideration not pertinent under the post-1947 FLSA." 42 F.4th 366, 376 (3d Cir. 2022) (quoting Campbell v. City of L.A., 903 F.3d 1090, 1105 (9th Cir. 2018)). Indeed, the Court's decisions on trial procedure, including the drafting of interrogatories and bifurcation, were influenced by Fischer's recognition of "[t]he essentially individual character of an FLSA collective action litigation." Id. at 377.

Nonetheless, "[c]ourts commonly allow representative employees to prove violations with respect to all employees. Thus, not all employees need to testify in order to prove the violations or to recoup back wages." Reich v. Gateway Press, Inc., 13 F.3d 685, 701-02 (3d Cir. 1994) (citations omitted); see also Stillman v. Staples, Inc., No. 07-849, 2009 WL 1437817, at *17-18 (D.N.J. May 15, 2009) (noting that plaintiffs can rely on representative testimony at trial and that such testimony has been accepted when there is substantial other evidence supporting inferences drawn from the testimony, the employer

systematically caused records to be falsified, or when the
plaintiff "establishes a uniform pattern or practice of wage
methods, conditions, and hours encompassing a class of
employees" (quoting Reich v. Chez Robert, Inc., 821 F. Supp.
967, 984 (D.N.J. Apr. 8, 1993))).  Plaintiffs bear the burden of
demonstrating that they are similarly situated to other members
of the collective, the defendant had a pattern and practice
regarding compensation, and that that pattern and practice
violated the FLSA, but "the burden is not an onerous one" and
"is met with respect to a particular employee 'if it is proved
that the employee has in fact performed work for which he is
improperly compensated and if the employee produces sufficient
evidence to show the amount and extent of that work as a matter
of just and reasonable inference.'" Stillman, 2009 WL 1437817,
at *18 (quoting Pegasus Consulting Grp. v. Admin. Rev. Bd. for
the Dep't of Lab., Wage and Hour Div., Emp. Standards Admin.,
No. 05-5161, 2008 WL 920072, at *18 (D.N.J. Mar. 31, 2008)).

    The court in Stillman was presented with a similar
procedural posture and facts as the case at bar.  Stillman
involved a collective of 342 opt-ins that alleged that they were
hired as sales managers, but their primary duties were non-
managerial.  Id. at *1.  At trial, thirteen sales managers
testified that the plaintiffs worked more than forty hours per
week without overtime; most of their time was spent performing

tasks such as cashiering, cleaning, and unloading trucks; and they did not possess final authority over personnel decisions – positions bolstered by corporate and non-party witnesses – and the jury found in favor of the plaintiffs.  Id. at *2, 15-16. The defendant moved for judgment as a matter of law or, in the alternative, a new trial, arguing that the plaintiffs failed to demonstrate representativeness because – among other reasons – plaintiffs only testified as to their individual work rather than the duties of the non-testifying plaintiffs, no evidence was presented as to the selection of the thirteen testifying plaintiffs or that they were similar to the non-testifying plaintiffs, no evidence was presented indicating that the testifying plaintiffs observed the non-testifying plaintiffs, and more than anecdotal evidence was required to establish company-wide patterns with respect to job duties and exempt statuses.  Id. at *2, 16.

The court denied the Rule 50 motion on the issue of representativeness, concluding that the testimony showed that the plaintiffs were all sales managers who worked more than forty hours per week without overtime, the testifying plaintiffs stated that they spent the majority of their time performing non-exempt work and could not make human-resources decisions, the testimony of a non-party and corporate officers supported the plaintiffs' testimony, and the same defense was common to

all claims – that the plaintiffs were exempt managers with
primarily managerial duties and that, if they performed mostly
hourly tasks, they were not performing their jobs properly.  Id.
at *19-20.  The court thus held that the "plaintiffs properly
offered their own accounts of their work at Staples and the jury
credited it and apparently found that performance problems some
of these plaintiffs had were insufficient to render such
employees dissimilar from others who held the same management
position" and there was sufficient evidence that the plaintiffs
were similarly situated and that the testifying plaintiffs were
representative.  Id. at *20.

Cases in nearby districts have also found evidence similar
to that which was presented here sufficient for
representativeness and rejected arguments similar to BAYADA's.
For instance, in Perry v. City of New York, 2,519 emergency
medical technicians and paramedics succeeded in a FLSA action
alleging that they were not compensated for pre- and post-shift
work and the defendants renewed their motion for judgment as a
matter of law and sought a new trial.  552 F. Supp. 3d 433, 438
(S.D.N.Y. Aug. 5, 2021).  On the issue of whether the plaintiffs
were similarly situated, the court noted that the plaintiffs'
burden "[wa]s considerably less stringent than the requirement
of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate'"
and that "the plaintiffs must merely 'share a similar issue of

law or fact material to the disposition of their FLSA claims,'
and 'dissimilarities in other respects should not defeat
collective treatment.'"   Id. at 442-43 (quoting Alonso v. Uncle
Jack's Steakhouse, Inc., No. 08 Civ. 7813, 2011 WL 4389636, at
*3 (S.D.N.Y. Sept. 21, 2011) and then Scott v. Chipotle Mexican
Grill, Inc., 954 F.3d 502, 516 (2d Cir. 2020)).   The Perry court
found no reason to go back on its earlier grant of a motion
finding that the plaintiffs were similarly situated when the
jury identified a common policy of the defendants of suffering
or permitting pre- and post-shift work without pay and "courts
routinely find that plaintiffs are similarly situated despite
individualized issues such as those raised by the City here."
Id. at 443 (quoting Adams v. City of N.Y., No. 1:16-cv-03445,
2019 WL 5722054, at *7 (S.D.N.Y. Aug. 29, 2019)).

Similarly, in Strauch v. Computer Sciences Corp., the
defendant was found liable for misclassifying system
administrators under the FLSA and state laws.   No. 3:14-CV-956,
2018 WL 4539660, at *1-2 (D. Conn. Sept. 21, 2018).   In the
context of its motion to decertify the FLSA collective and state
classes, the defendant alleged that the plaintiffs "cherry-
pick[ed]" those who testified and that the "highly varied and
statistically defective representative testimony to impose
liability" would deny it due process.   Id. at *14.   The court
rejected this argument, finding that – to the extent that the

13

testifying plaintiffs were not representative – the defendant had the opportunity to rebut that evidence with its own presentation of testimony.  Id.

In its reply, BAYADA contends that Stillman is non-binding and factually distinguishes it from the case at bar.  (ECF 334 at 6-9).  Key differences, according to BAYADA, include Plaintiffs' ability to make some human-resources decisions, the non-party corroborative testimony in Stillman not present in the instant matter, and – most importantly – a common defense in Stillman that is inapplicable here as BAYADA has made specific challenges such as Ivanovs not working more than forty hours in a week; evidence that Testifying Plaintiffs Katie Hoffman and Josie Gupton evaluated, counseled, managed, disciplined, or supervised field employees; and Testifying Plaintiff Tiffany Potteiger stopped fully engaging in her position after a few months.  (Id. at 7-8).  Plaintiffs further have made it impossible for a jury to determine whether Plaintiffs shared similar work habits and duties or were impacted by a common policy or practice due to their failure to present such evidence, according to BAYADA.  (Id. at 8-9).

Reviewing the record, the Court agrees that the testimony at trial diverged in, among other ways, CSMs' ability to evaluate and supervise (see, e.g., Trial Tr. at 145:12-16 (Testifying Plaintiff Adriana Vargas-Smith supervised the

14

nursing team in non-clinal respects); id. at 238:3-7 (Testifying
Plaintiff Blaire Yarbrough would sometimes observe field staff,
but not evaluate them); id. at 343:25 to 344:3 (Testifying
Plaintiff Christina Hess did not supervise the care and
assistance provided to clients); id. at 503:14-19, 515:6-16
(Hoffman sometimes performed performance evaluations, corrective
actions, and payroll); id. at 1067:15 to 1068:15 (Division
Director Lisa Stanley testified that interviewing and
performance evaluations were secondary duties for CSMs); id. at
1216:16-25 (Director Erica Kjenstad testified that Hoffman had
human-resources responsibilities including evaluations,
coaching, and counseling); id. at 1360:22 to 1361:10 (Regional
Director of Operations for the Southeast Richard Hopson
testified that Gupton supervised field staff); id. at 1409:19 to
1410:5 (Downer conducted performance evaluations); id. at
1555:7-10 (Chief Operating Officer of the Skilled Nursing Unit
Cristen Toscano testified that CSMs conducted annual performance
evaluations for field staff)), develop staff (see, e.g., id. at
145:17 to 146:4 (Vargas-Smith did not counsel or develop staff,
but sat in on such sessions); id. at 457:22 to 458:1 (Hoffman
did not provide feedback or direction to nurses in the field);
id. at 667:17 to 668:5 (Gupton conducted quarterly reviews;
assigned and monitored professional development training; and
provided feedback including counseling, pay-rate changes, and

15

recognition); id. at 1297:12-19 (Division Director Matt Delle
Cave testified that CSMs, including Vargas-Smith, counsel and
develop nurses)), recruit (see, e.g., id. at 260:9-17 (Yarbrough
posted recruitment ads and reviewed resumes); id. at 392:25 to
393:17 (Hess participated in the recruitment of field staff,
which took up about five percent of her working time); id. at
891:25 to 892:7 (Potteiger did not recruit); id. at 1387:8-18
(Downer was "not very involved in recruitment"); id. at 1443:22
to 144:15 (Area Director Timothy Peterkin testified that Taylor
assisted with recruitment and related events)), participate in
or lead office meetings (see, e.g., id. at 98:16 to 99:6
(Vargas-Smith sometimes contributed to – but never hosted or led
– a meeting); id. at 228:1-12 (Yarbrough testified that office
stand-up meetings were led by the director); id. at 513:10-16
(Hoffman led stand-up meetings on several occasions); id. at
605:20 to 606:6 (Gupton participated in stand-ups, though they
were not led by a specific person); id. at 993:5-9 (in
Divisional Client Service Manager Sharon Mrozinski's experience,
CSMs led stand-up meetings); id. at 1061:18-20 (CSMs led stand-
up meetings in Stanley's experience)), and give out bonuses
(see, e.g., id. at 89:13-25 (Vargas-Smith could offer bonuses in
amounts subject to the director's approval); id. at 310:20 to
311:3 (Yarbrough could offer bonuses with director approval);
id. at 495:19 to 496:8 (Hoffman did not have a standing bonus

amount she could give out, but her recommendations were often approved); id. at 1061:21 to 1062:1 (CSMs could offer bonuses without director approval, according to Stanley); id. at 1363:22 to 1364:5 (Hopson testified that CSMs had discretion to give out bonuses)).

At the same time, the record also shows relative consistency in CSMs' responsibilities in marketing and finance (see, e.g., id. 118:19 to 120:14 (Vargas-Smith did not participate in marketing, conduct financial audits, develop the budget, or negotiate or enter into contracts); id. at 240:16-22, 244:21 to 245:14 (Yarbrough did not have a role in the office budget, financial audits, or contracting); id. at 350:21 to 351:23 (Hess did not have budget input, enter into contracts, collect funds, or market); id. at 458:2-23 (Hoffman did not have input in budgeting, contract negotiations, collections, or marketing); id. at 620:21 to 623:2 (Gupton did not have a role in budgeting, contracts, collection, auditing, or taxes and had a limited role in marketing); id. at 1273:5-7 (former Division Director Cathy Jane Sorenson testified that CSMs did not have a direct role in budgeting); id. at 1411:3-17 (Downer did not develop the budget, contract, collect money, or conduct audits)) and authority to hire or fire staff, (see e.g., id. at 101:4-10 (Vargas-Smith did not have the authority to hire or fire and did not participate in such decisions); id. at 345:16 to 346:9,

17

411:18-22 (Hess would go over orientations with new hires, but did not have the authority to hire and did not sit in on interviews); id. at 436:19 to 438:8 (Hoffman did not have the discretion to hire or fire, but made firing recommendations and sometimes asked standard interview questions and took notes); id. at 607:16 to 608:20, 665:14 to 666:24 (Gupton could not hire or fire, did not make recommendations for terminations, but did participate in interviews and gave opinions); id. at 896:12 to 897:9 (Potteiger could not hire or fire and was not involved in either process); id. at 978:16 to 979:1 (Mrozinski testified that directors possessed final authority to hire); id. at 1248:19 to 1250:10, 1273:8-24 (Sorenson testified that Opt-In Plaintiff Jenna McWilliam was "the first one to identify that there was an issue" with an employee and her opinions were given weight and, while CSMs had authority to fire, that did not occur in her experience); id. at 1406:19 to 1407:23 (Downer would sometimes attend, but not participate in, interviews, could not hire or fire, and did not make related recommendations); id. at 1500:4-13 (Taylor did not have the authority to hire or fire or make recommendations as to terminations)).  Important to their claims, Plaintiffs also consistently testified that they were not compensated for hours worked over forty.  (See id. at 127:5-10 (Vargas-Smith); id. at 252:19 to 253:2 (Yarbrough); id. at 353:19-21 (Hess); id. at 462:4-6 (Hoffman); id. at 633:17 to

634:2 (Gupton was paid set sums for on-call work, but not overtime); id. at 909:1-3 (Potteiger); id. at 1416:17-19 (Downer)).

The Court concludes that BAYADA's challenges are similar to those raised and ultimately rejected in Stillman.  See 2009 WL 1437817, at *16 (summarizing the defendant's arguments as including the plaintiffs' failure to provide testimony as to the non-testifying plaintiffs' primary duties, evidence that the experiences of the testifying plaintiffs were similar to the non-testifying opt-ins, or a showing that the testifying plaintiffs worked with or observed the non-testifying plaintiffs).  The Court is reminded that representative testimony is appropriate when plaintiffs "establish[] a uniform pattern or practice of wage methods, conditions, and hours encompassing a class of employees," see id. at *18 (quoting Reich, 821 F. Supp. at 984), and that a collective's burden of establishing that they are similarly situated, a defendant engaged in a pattern and practice regarding compensation, and that the pattern and practice violated the FLSA is "not an onerous one" and may be satisfied by showing that employees performed work for which they were improperly compensated and "the amount and extent of that work as a matter of just and reasonable inference," id. (quoting Pegasus Consulting Grp., 2008 WL 920072, at *18); see also Ruffin v. Avis Budget Car

Rental, LLC, No. 11-1069, 2014 WL 294675, at *3 (D.N.J. Jan. 27, 2014) (determining, in denying a motion to decertify, that the plaintiffs primarily performed the same duties, mostly held the same job title and description, and were subject to the same policies – including not receiving overtime; disparities in testimony were not material and were outweighed by similarities; and the managerial tasks performed were limited).  "[T]he collective-action framework presumes that similarly situated employees are representative of each other and have the ability to proceed to trial collectively."  Monroe v. FTS USA, LLC, 860 F.3d 389, 409 (6th Cir. 2017), cert. denied, 138 S. Ct. 980 (2018) (rejecting the defendants' representative argument and the dissent's contention that because the time-shaving policy was applied differently among individual plaintiffs, representativeness was not satisfied).

It is not the Court's role at this juncture to declare a victor or even commentate on the comparative quality of the evidence presented at trial.  Rather, the question before the Court is whether "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."  See Baran, 401 F. Supp. 3d at 479 (quoting Raiczyk, 377 F.3d at 269).  The Court cannot so find here.  The Court holds that it was possible from the evidence presented at trial for a jury to conclude based on the common facts presented

– and in weighing the relative importance and credibility of evidence that was dissimilar or in dispute – that Testifying Plaintiffs other than Ivanovs were subject to a pattern and practice in which they were not compensated for hours worked per week over forty, that pattern and practice violated the FLSA, and that their testimony and evidence was adequately representative of the collective.  See cf. Johnson, 561 F. Supp. 2d at 579 ("The opt-in plaintiffs' characterizations of their day-to-day work activities presented through trial erased the Court's earlier understanding that plaintiffs were similarly situated.").

The fact that BAYADA has presented individualized defenses does not sway the Court in a different direction.  The obvious common theme of these defenses was that CSMs are appropriately exempted from overtime – Hoffman and Gupton were properly exempted from overtime because they managed employees. Potteiger's activities may not have reflected exempt duties because she disengaged from her work.  A "court may exercise its discretion to determine whether individual defenses make a collective action unmanageable."  Prise v. Alderwoods Grp., Inc., 817 F. Supp. 2d 651, 671 (W.D. Pa. Sept. 9, 2011).  The Court disagrees with BAYADA that its individualized defenses necessitate a result different from Stillman.  See Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 382 (W.D. Pa. Mar. 9,

21

2011) ("Defendant will assert similar defenses against most, if not all, class members, even if the application of the defenses will vary depending on individual circumstances.  Nothing about the collective forum will prevent Defendant from employing these defenses.  To the contrary, during trial, Defendant will be free to present evidence of lawful employment policies and practices, cross-examine individual representative plaintiffs, and to call others with material testimony helpful to Defendant's case. Moreover, requiring the court to apply similar defenses in 254 separate trials as opposed to against plaintiffs within the collective action hardly promotes efficiency." (citations omitted); see also Garcia v. Vertical Screen, Inc., No. 18-4718, 2022 WL 282541, at *4 (E.D. Pa. Jan. 31, 2022) (granting a motion for final certification and finding that the individualized defenses identified – attacks on the plaintiffs' credibility requiring individualized cross-examinations – were insufficient to defeat certification).

Lest the Court's difficulty in arriving at this decision be lost in its text, this opinion should not be interpreted as it finding that a jury could not have reasonably concluded that Plaintiffs failed to adequately demonstrate representativeness. It also does not foreclose the possibility that a similar motion following a new trial featuring new evidence would be met with a different holding.

Having concluded that judgment as a matter of law is inappropriate as to the alleged deficient representativeness, the Court also rejects the related arguments raised in BAYADA's brief.  BAYADA, for instance, attacks the selection of the seven Testifying Plaintiffs – claiming that Plaintiffs "selected the seven individuals that they believed gave them the best chance of winning, without regard to whether their experiences were indicative of the others or whether they fairly represented the class."  (ECF 328-1 at 20-21).  In actuality, the Court deciphers from the parties' amended joint pretrial order that the seven Testifying Plaintiffs were selected from a subset of Plaintiffs for which depositions were taken during discovery.  (ECF 269 at 29).  It does not surprise the Court that Plaintiffs might have selected from that subset the members they thought would best present their claims and to the extent that that alleged strategy inadequately accounted for representativeness, Plaintiffs risked – and continue to risk – that a jury or the Court may find that Testifying Plaintiffs inadequately represent the other members of the collective.  The answer to BAYADA's contention, therefore, is – as it has done – to challenge Testifying Plaintiffs with its own testimony and evidence.  See Strauch, 2018 WL 4539660, at *14.

The Court further is unpersuaded by BAYADA's citation to Green v. Harbor Freight Tools USA, Inc., 888 F. Supp. 2d 1088

(D. Kan. Aug. 17, 2012), for support of the proposition that –
because of Plaintiffs' refrain throughout trial that paper job
descriptions, resumes, and similar materials do not count as
compared to actual practices – representativeness and liability
may not be premised on corporate policies and individualized
evidence is further untenable.  (ECF 328-1 at 23-24).

Green was decided at the decertification stage and merely
determined that, because plaintiffs argued that their job
description did not accurately depict their job duties, a fact-
intensive inquiry as to individual plaintiffs' duties was
necessary and their mere classification as exempt did not itself
render them similarly situated or do away with the need for
individualized factual determinations.  888 F. Supp. 2d at 1098-
99.  Here, a trial featuring individualized testimony has
already been conducted with the Court largely agreeing with
BAYADA's proposed procedures.  Furthermore, "at trial,
plaintiffs can rely on representative evidence to prove that the
defendant's practices or policies impacted similarly situated
employees," Stillman, 2009 WL 1437817, at *17, and their burden
may be sustained even when the employer has maintained official
policies consistent with the FLSA, see Reinig, 2017 WL 8941219,
at *13.

Finally, the Court disagrees with BAYADA's position that
permitting Plaintiffs to prevail with the evidence presented

24

would violate its due-process rights or the Rules Enabling Act.
(ECF 328-1 at 28-30).  The Rules Enabling Act permits the
Supreme Court to establish general rules of practice and
procedure so long as said rules do "not abridge, enlarge or
modify any substantive right."  28 U.S.C. § 2072(a)-(b).
Persuasively, in Tyson Foods, Inc. v. Bouaphakeo, the Supreme
Court rejected an argument in favor of a broad prohibition of
representative evidence in class actions, noting that
representative samples – like the expert observations at issue
there – are often the only means of establishing liability and
concluding that if representative evidence would be relevant in
proving an individual claim, it could not be deemed improper
merely because it was presented on behalf of a class because
doing so would itself violate the Rules Enabling Act.  577 U.S.
442, 454-55 (2016); see also cf. Dzielak v. Whirlpool Corp., No.
2:12-89, 2017 WL 6513347, at *12 (D.N.J. Dec. 20, 2017)
(analyzing Tyson Foods, Inc. and concluding that the plaintiffs'
energy-expense estimates did not closely approximate the usage
of individual putative class members and would likely be
unusable for individual actions given the disparity in
individuals' energy usage).  Here, unlike Wal-Mart Stores, Inc.
v. Dukes, 564 U.S. 338 (2011), which BAYADA cites, the Court has
found that Plaintiffs are similarly situated and the testimony
of other CSMs would provide appropriate and persuasive evidence

if the case at bar was brought as sixty-two individual actions.
See <u>Tyson Foods, Inc.</u>, 577 U.S. at 458-59 (differentiating <u>Dukes</u>
as the employees there were not similarly situated while in
<u>Tyson Foods, Inc.</u> the employees worked at the same facility,
performed the same work, and were paid under the same policy and
thus could have introduced the expert study in individual
actions).

Further, the Court is not persuaded by BAYADA's argument
that it is unable to assert individual defenses against Non-
Testifying Plaintiffs and does not even have sufficient evidence
due to limits placed on depositions, interrogatories, and
document requests.  (ECF 328-1 at 29).  Courts have rejected
similar due-process claims regarding representative testimony.
See <u>Pierce v. Wyndham Vacation Resorts, Inc.</u>, 922 F.3d 741, 749
(6th Cir. 2019) (rejecting the defendant's argument that the use
of representative testimony violated its due-process rights when
it was permitted to cross-examine each testifying witness and
call anyone it so chose as a witness); <u>see also</u> <u>Heath v. Google
LLC</u>, 345 F. Supp. 3d 1152, 1177 (N.D. Cal. Aug. 27, 2018)
(concluding, in the context of a motion to decertify an Age
Discrimination in Employment Act case, that the plaintiffs
persuasively contended that collective treatment safeguarded
their due-process rights as they were less able to bear the cost
of multiple individual trials than the defendant).

## B. BAYADA's Motion Seeking to Apply the FWW Method to Calculate Damages (ECF 329)

BAYADA next advances that, should any individual Plaintiff prevail, the FWW method should be applied to damages for overtime pay because the record demonstrates that Plaintiffs each understood that they were to be compensated by the same salary no matter how many hours they worked.  (ECF 329-1 at 2-5).  BAYADA advances that the FWW has been applied to FLSA misclassification cases such as this one and no reasonable jury could find that Plaintiffs did not understand that their salaries were to compensate them for all hours worked.  (Id. at 5-7).

The FWW is rooted in the Supreme Court's decision Overnight Motor Transportation Co. v. Missel, in which a rate clerk was paid a fixed weekly salary regardless of hours worked and sought to collect unpaid overtime.  See 316 U.S. 572, 574-75 (1942).  Faced with the task of computing overtime for employees compensated by a fixed rate, the Supreme Court concluded that

> Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week. As that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked. It is true that the longer the hours the less the rate and the pay per hour.  This is not an argument, however, against this method of determining the regular rate of employment for the week in question.

Id. at 580.

Missel was incorporated into the FLSA in 1968, see
Verderame v. RadioShack Corp., 31 F. Supp. 3d 702, 704 (E.D. Pa.
July 10, 2014), and as currently in force[3] permits use of the FWW
to compute overtime when the employee's work hours fluctuate
week to week, the employee receives a fixed salary that does not
fluctuate with the hours worked, the fixed salary exceeds the
minimum hourly wage during weeks in which the number of hours
worked is greatest, the employee and employer have a clear and
mutual understanding that the fixed salary represents
compensation for all hours worked regardless of number, and the
employee receives overtime compensation for all overtime hours
worked of no less than half the regular rate of pay – the
regular rate varying week to week depending on the hours
actually worked, 29 C.F.R. § 778.114(a).

---

[3] The parties' briefs do not expressly question to applicability
of the most recent revision to Section 778.114 and, in fact,
BAYADA relies on the 2020 revision to rebut Plaintiffs'
opposition to the extent that they argue that their on-call pay
renders the FWW inappropriate. (ECF 333 at 3). Persuasively,
the Eleventh Circuit recently concluded that the 2020 revision
to Section 778.114 was inapplicable to the matter at issue there
because the relevant work period for the plaintiff was from 2011
to 2016 and "administrative rules generally are not applied
retroactively." See Hernandez v. Plastipak Packaging, Inc., 15
F.4th 1321, 1326 n.3 (11th Cir. 2021) (quoting Hargress v. Soc.
Sec. Admin., Comm'r, 883 F.3d 1302, 1308 (11th Cir. 2018)).
Because the Court concludes that differences between the 2020
revision and its predecessor are not outcome-determinative here,
the Court will refer to the present version and reference its
predecessor as relevant.

The regulation acknowledges that "[t]ypically, such fixed salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate compensation for long workweeks as well as short ones, under the circumstances of the employment as a whole," id. at § 778.114(c), and provides helpful illustrations explaining how the FWW calculates overtime in practice.  For instance, for an employee earning $600.00 per week and working thirty-seven-and-a-half, forty-four, fifty, and forty-eight hours over four weeks, their regular hourly rates would be $16.00, $13.64, $12.00, and $12.50, respectively – and they would be owed $600.00 with no overtime for the first week, $627.28 for the second week ($600.00 plus four times half the regular rate of $13.64), $660.00 for the third week ($600.00 plus ten times half the regular rate of $12.00), and $650.00 for the fourth week, ($600.00 plus eight times half the regular rate of $12.50).  Id. at § 778.114(b)(1); see also Morales v. Aqua Pazza LLC, No. 20-6690, 2022 WL 1718050, at *6 n.10 (D.N.J. May 27, 2022) (acknowledging that under the FWW "the 'regular rate' must be separately calculated for each week by dividing the weekly salary by the hours actually worked by the employee during that week.").  "[T]he burden is on the employer, and not the employee, to establish that the parties mutually agreed upon th[e FWW] form of compensation."  Bredbenner v. Liberty Travel,

29

<u>Inc.</u>, No. 09-cv-00905, 2009 WL 2391279, at *2 (D.N.J. July 31, 2009).

Plaintiffs respond by asserting, among other arguments,[4] that BAYADA has failed to demonstrate its burden of showing that there was a clear and mutual understanding and urges the Court to follow out-of-jurisdiction decisions finding the FWW to be inappropriate for misclassification cases in which overtime has not been paid.  (ECF 330 at 6-7, 12-16).

Interpreting the earlier version of Section 778.114, the court in <u>Depalma v. Scotts Co., LLC</u> expressly found that the FWW applies to exemption misclassification cases.  No. 13-7740, 2019 WL 2417706, at *13 (D.N.J. June 10, 2019).  <u>Depalma</u> dealt with what was interpreted as a motion in limine for the FWW to be applied to damages and recognized a circuit split as to whether Section 778.114 or <u>Missel</u> provided the authority to use the FWW

---

[4] The Court briefly recognizes Plaintiffs' argument that judgment here would be premature.  (ECF 330 at 3-5).  While the Court finds the prematurity argument more persuasive here than in Plaintiffs' brief as to representativeness because Phase 2 of the trial never occurred, BAYADA correctly notes, (ECF 333 at 2), that Plaintiffs indicated in the amended joint final pretrial order that they "intend[ed] to primarily utilize Defendant's business records a[s] to the number of full workweeks worked by the plaintiffs listed in Exhibit A, their respective dates of employment, and their rates of compensation" to present damages and the sole witness to be presented would have been Nicoletta Roditti "to merely explain the math, the application of the findings of the jury, and present the final amount of damages," not any relevant clear and mutual understanding, regular rate of pay, or the like,(ECF 269 at 15-16).

in misclassification cases.  Id. at *1, 11-12 (discussing cases,
including the Seventh Circuit's decision in Urnikis-Negro v.
American Family Property Services, 616 F.3d 665, 666, 675-76,
678, 681 (7th Cir. 2010), which found that Section 778.114 does
not provide authority to apply the FWW method to
misclassification cases as it is not remedial in nature and
"requires that the parties mutually understand that the employee
is paid for overtime work, which is an impossible agreement to
reach if the employer believes the employee to be [exempt] and
therefore not subject to overtime").  Absent binding precedent
from the Third Circuit, Depalma followed the approach of
Urnikis-Negro and the Fourth Circuit's decision in Desmond v.
PNGI Charles Town Gaming, L.L.C., 630 F.3d 351 (4th Cir. 2011),
and concluded that the FWW could be used for damages in
misclassification cases so long as the parties had a mutual
understanding that compensation was for all hours worked and the
salary provided did not dip below minimum wage.  Id. at *13
(citing Desmond, 630 F.3d at 354).  Depalma determined that
sufficient evidence was brought forth by the defendant that
there was such a clear and mutual understanding and rejected the
plaintiffs' contention that they were not initially aware that
they would work as many hours as they did – finding that the
true issue was whether there was a mutual understanding that
their weekly salaries would represent their compensation

31

regardless of hours worked.  Id. at *13.

The court in Devine v. Northeast Treatment Centers, Inc., too, noted a circuit split in applying Section 778.114 or Missel to misclassification cases and recognized that courts within the Third Circuit, including Depalma, had not relied on Section 778.114 because "'the best approach is not to conflate the fluctuating workweek regulation with the damages calculation' because 'the fluctuating workweek regulation itself neither authorizes nor prohibits the use of the half-time method in assessing damages in an FLSA misclassification case.'"  No. 20-02417, 2021 WL 4803819, at *6 (E.D. Pa. Oct. 14, 2021) (quoting Seymour v. PPG Indus., Inc., 891 F. Supp. 2d 721, 733 (W.D. Pa. 2012)).  Ultimately, the court found that the FWW was applicable as the plaintiffs understood that their salaries represented compensation for all time worked.  Id.

The Court is satisfied that the FWW may be applied to misclassification cases, but nonetheless pauses as to its application in the present matter.  BAYADA's brief does well to highlight Plaintiffs' testimony that they understood that their salaries represented compensation for all hours worked.  (ECF 329-1 at 2-3 (citing Trial Tr. 122:22 to 123:2, 278:15-17, 360:25 to 361:2, 533:15-17, 705:20-23, 787:3-5, 908:23-25, 922:12-13)).  However, the Court holds that the clear and mutual understanding between the parties is not limited to the fact

that an employee's fixed salary is intended to compensate them
regardless of the number of hours worked, but rather must also
contemplate that the employee's hours would actually fluctuate.
See Menefee v. N-Title, LLC, No. A-19-CV-00737, 2021 WL 3413319,
at *9 (W.D. Tex. July 9, 2021) ("Defendants would need to show
that there was an agreement between the parties that Plaintiff's
regular hours would fluctuate on a weekly basis, not that
Plaintiff understood she would have to work whatever hours were
required for the job."). Actual fluctuation of hours is a
precondition for applying the FWW under both Missel, see Black
v. SettlePou, P.C., 732 F.3d 492, 499 (5th Cir. 2013) ("As
directed by Missel, the FWW method may only be applied to
calculate overtime premiums when there is a contractual
agreement between the employer and the employee that the
employee will be paid a fixed weekly wage for hours that
fluctuate from week to week." (emphasis added)), and Section
778.114, see 29 C.F.R. § 778.114(a)(1) (including "[t]he
employee works hours that fluctuate from week to week" as among
the predicates for applying the FWW); 29 C.F.R. § 778.114(a)
(effective May 5, 2011 to Aug. 6, 2020) ("An employee employed
on a salary basis may have hours of work which fluctuate from
week to week and the salary may be paid him pursuant to an
understanding with his employer that he will receive such fixed
amount as straight time pay for whatever hours he is called upon

33

to work in a workweek, whether few or many.").

At least some evidence at trial indicated that Plaintiffs worked consistent hours. (See Trial Tr. 125:5-23 (Vargas-Smith worked 8:00 a.m. to 6:00 p.m. Monday through Thursday and 8:00 a.m. to 5:00 p.m. on Fridays); id. at 250:1-8, 251:4-11 (Yarbrough understood that she would work forty hours per week during office hours of 8:30 a.m. to 5:30 p.m. and, in practice, typically worked from 8:00 a.m. to 6:00 p.m.); id. at 353:25 to 354:14 (Hess understood that she would work slightly over forty hours per week during office hours of 8:30 a.m. to 5:00 p.m. and would arrive between 7:00 a.m. and 7:30 a.m. and leave by 5:00 p.m. to 5:30 p.m.); id. at 462:7:12, 462:23 to 463:10 (Hoffman originally understood that she would work 8:30 a.m. to 5:00 p.m. and in practice worked 8:00 a.m. to 5:30 p.m.); id. at 598:8-16, 638:15-23 (Gupton initially understood her workday to be 8:30 a.m. to 5:00 p.m., but actually worked from 8:20 a.m. to 5:30 or 6:00 p.m. daily); id. at 910:4-14 (Potteiger was told that her hours would be 8:30 a.m. to 5:00 p.m., but she typically arrived between 8:00 and 8:30 a.m. and left between 6:00 and 6:30 p.m.)).

Evidence that hours were intended to be consistent was elicited from non-Plaintiffs, as well. For instance, Toscano, while reviewing a training record published to the jury, acknowledged that it stated "that the standard workday for full-

34

time office employees is 8:30 to 5:00," (id. at 1171:16-23), and Peterkin testified that the expected workday was 8:30 a.m. to 5:00 p.m., (id. at 1467:13-14).  Even if Plaintiffs' start and end times varied slightly day to day, it does not necessarily follow that their cumulative hours worked actually fluctuated week to week or that any such fluctuation was part of any clear and mutual understanding.

The Court cannot thus find that Plaintiffs' hours were contemplated to – or did in fact – fluctuate.  See Menefee, 2021 WL 3413319, at *9; Nam v. Permanent Mission of Republic of Korea to United Nations, No. 21-cv-06165, 2023 WL 2138601, at *22 n.17 (S.D.N.Y. Feb. 21, 2023) ("The record in this case does not support the use of th[e FWW] method because Plaintiff's employment contracts state that he was expected to work, and was compensated for working, a regular 9:00 A.M. to 6:00 P.M. work schedule and was then provided additional compensation for off schedule hours."); see also cf. Rene v. Fulton Cnty. Sch. Dist., No. 1:19-CV-04721, 2020 WL 7496841, at *2 (N.D. Ga. Nov. 2, 2020) (finding Section 778.114(a)(1) to be satisfied because the school resource officers did not work a set schedule, but rather had their hours vary week to week); but see Diaz v. Bloomberg, L.P., No. 22-CV-7251, 2023 WL 3505522, at *3 (S.D.N.Y. May 17, 2023) (concluding that the plaintiff's hours fluctuated week to week because she began working fifteen to thirty minutes early

on multiple occasions, worked beyond the end of her shift daily, and worked through lunch two or three times per week and rejecting the plaintiff's argument that her hours did not "'materially' vary").

This holding should not be interpreted as the Court concluding that the FWW would be inapplicable to Plaintiffs following a future trial.  Rather, it merely recognizes that "[u]ltimately, the 'employee's regular rate of pay is a <u>factual</u> issue, which requires a threshold determination whether the salary was intended to compensate for a fixed number of hours, or alternatively for all hours worked.'"  <u>See</u> <u>Devine</u>, 2021 WL 4803819, at *6 (quoting <u>Seymour</u>, 891 F. Supp. 2d at 733).  As with BAYADA's motion regarding representativeness, the Court cannot conclude based on the evidence presented at trial that no jury could find against BAYADA as to the applicability of the FWW.  <u>See</u> <u>Baran</u>, 401 F. Supp. 3d at 479.  Its motion is therefore denied.

## IV. Conclusion

For the reasons stated above, BAYADA's renewed motions for judgment as a matter of law, (ECF 328; ECF 329), will be denied.

An Order consistent with this Opinion will be entered.


Date: May 25, 2023                    s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.